## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CATHRYN E. LEGGIO,**   **CIVIL ACTION**
    **Plaintiff**

**VERSUS**   **NO. 22-1232**

**OCHSNER CLINIC FOUNDATION,**   **SECTION: "E" (5)**
    **Defendant**

## ORDER AND REASONS

Before the Court is a Motion for Summary Judgment filed by Ochsner Clinic Foundation ("Defendant" or "Ochsner").[1] The motion is opposed.[2] For the reasons that follow, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## PROCEDURAL BACKGROUND

This case stems from an employment relationship between Plaintiff and Ochsner that was terminated in October 2020.[3] In December 2019, Plaintiff was diagnosed with breast cancer, underwent treatment, and, in the process, was required to take leave from work.[4] Ochsner contends it terminated Plaintiff's employment because she sent photographs of her breasts to a subordinate,[5] who was also her medical power of attorney, friend, and personal nurse.[6] Plaintiff contends in reality Ochsner terminated Plaintiff's employment on account of her breast cancer and need to miss work or work remotely to seek medical treatment.[7] On May 4, 2022, Plaintiff initiated this lawsuit, bringing claims pursuant to the Americans with Disability Act ("ADA") and the Family Medical Leave Act

---

[1] R. Doc. 22.
[2] R. Doc. 31.
[3] R. Doc. 1.
[4] *Id.* at p. 3, ¶ 9.
[5] *Id.* at p. 6, ¶ 21.
[6] *Id.* at p. 3, ¶ 10.
[7] *See generally* R. Doc. 1.

("FMLA").[8] On February 27, 2023, Ochsner filed the instant Motion for Summary Judgment,[9] which Plaintiff opposes,[10] and which was submitted for this Court's consideration on March 27, 2023.[11]

## FACTUAL BACKGROUND

### I.    Undisputed Facts

The following facts are not in dispute. On October 24, 2016, Ochsner hired Plaintiff as a clinical research coordinator.[12] In late November 2016, Plaintiff took six weeks of medical leave after the birth of her child, having no issue taking leave.[13] Two years later, in November 2018, Ochsner promoted Plaintiff to supervisor of clinical trials.[14] Ochsner uses a third party administrator, Sun Life, to manage employee requests for leave under the FMLA by collecting information on the circumstances surrounding an employee's request and notifying employees whether their request has been approved.[15] In March of 2019, Plaintiff requested and took 12 weeks of FMLA leave after the birth of her second child.[16] No one made any negative comments, treated Plaintiff negatively, or gave Plaintiff any problems for taking FMLA leave related to the birth of her child.[17] Further, while employed by Ochsner, to Plaintiff's knowledge, no supervisor or manager made any negative comments about Plaintiff's use of any FMLA leave.[18]

In her role as supervisor of clinical trials, two employees reported directly to Plaintiff during the relevant time period: clinical research nurse April Wendt and clinical

---

[8] *Id.*
[9] R. Doc. 22.
[10] R. Docs. 31 and 40.
[11] R. Doc. 44 (Ochsner's second reply); *see also* R. Doc. 37 (Ochsner's first reply).
[12] R. Doc. 22-1 at p. 1, ¶ 1; R. Doc. 40 at p. 1, ¶ 1.
[13] R. Doc. 22-1 at p. 1, ¶ 2; R. Doc. 40 at p. 1, ¶ 2.
[14] R. Doc. 22-1 at p. 1, ¶ 3; R. Doc. 40 at p. 1, ¶ 3.
[15] R. Doc. 22-1 at p. 1, ¶ 4; R. Doc. 40 at p. 1, ¶ 4.
[16] R. Doc. 22-1 at p. 2, ¶ 5; R. Doc. 40 at p. 1, ¶ 5.
[17] R. Doc. 22-1 at p. 2, ¶ 6; R. Doc. 40 at p. 1, ¶ 6.
[18] R. Doc. 22-1 at p. 5, ¶ 29; R. Doc. 40 at p. 5, ¶ 29.

research coordinator Noor Deepika Makan.[19] Before the COVID pandemic, clinical research employees at Ochsner Kenner, including Plaintiff, Ms. Wendt, and Ms. Makan, were required to work in the office absent unusual circumstances.[20]

In December 2019, Plaintiff was diagnosed with breast cancer and began to undergo treatment.[21] That same month, Dr. Mark Roberts became dean of research for Ochsner.[22] As dean of research, Dr. Roberts oversees all clinical research and all other research activities across Ochsner's health systems.[23] After Plaintiff's December 2019 diagnosis, Plaintiff requested and received an accommodation under the ADA for intermittent leave to attend appointments and receive treatments.[24] Ochsner granted Plaintiff an accommodation of protected unpaid leave for her appointments and treatments without being required to use her paid time off.[25] Plaintiff could take ADA protected leave for up to four hours or for an entire day, as needed.[26] Plaintiff's accommodation for intermittent leave under the ADA was initially granted for an entire year (through December 2020), but it could be extended if needed.[27]

From July 1, 2020 to August 17, 2020, Plaintiff took FMLA leave when she had double mastectomy surgery.[28] Plaintiff requested the FMLA leave though Sun Life, which informed Plaintiff that she had been approved for eight weeks of FMLA leave.[29] Plaintiff returned to work on August 17, 2020, after taking only six of the approved eight weeks of

---

[19] R. Doc. 22-1 at p. 2, ¶ 7; R. Doc. 40 at p. 1, ¶ 7.
[20] R. Doc. 22-1 at p. 2, ¶ 8; R. Doc. 40 at p. 1, ¶ 8.
[21] R. Doc. 22-1 at p. 2, ¶ 9; R. Doc. 40 at p. 1, ¶ 9.
[22] R. Doc. 22-1 at p. 2, ¶ 10; R. Doc. 40 at p. 1, ¶ 10.
[23] R. Doc. 22-1 at p. 2, ¶ 11; R. Doc. 40 at pp. 1-2, ¶ 11 (admitting in substance).
[24] R. Doc. 22-1 at p. 3, ¶ 12; R. Doc. 40 at p. 2, ¶ 12.
[25] R. Doc. 22-1 at p. 3, ¶ 13; R. Doc. 40 at p. 2, ¶ 13 (to the extent denying, citing irrelevant deposition testimony of Ansley Hammons).
[26] R. Doc. 22-1 at p. 3, ¶ 14; R. Doc. 40 at p. 2, ¶ 14.
[27] R. Doc. 22-1 at p. 3, ¶ 16; R. Doc. 40 at p. 2, ¶ 16.
[28] R. Doc. 22-1 at p. 3, ¶ 17; R. Doc. 40 at p. 3, ¶ 17.
[29] R. Doc. 22-1 at p. 3, ¶ 18; R. Doc. 40 at p. 3, ¶ 18.

FMLA leave.[30] Plaintiff attributes her early return to a phone call she received from Ochsner's Samantha Bright in which Plaintiff was asked to return to work early.[31] Plaintiff did not inform anyone at Ochsner of this alleged call.[32] During Plaintiff's six-week FMLA leave, her then-supervisor and then-director left Ochsner; when Plaintiff returned to work, she reported directly to Dr. Mark Roberts, dean of research.[33] Shortly thereafter, Dr. Roberts informed Plaintiff that she would additionally report to Ms. Ansley Hammons, who was manager of clinical research.[34]

A month after returning from six weeks of FMLA leave, on or around September 24, 2020, Plaintiff received a written copy of a coaching plan drafted after a meeting between Plaintiff, Ms. Hammons, Ms. Bright, and human resources consultant Lara Leone.[35] The coaching plan was recommended by Ms. Hammons due, at least in part, to complaints made by Plaintiff's subordinate Deepika Makan.[36] Specifically, Ms. Makan complained about Plaintiff showing favoritism to Ms. Wendt, about Plaintiff treating Ms. Makan "as a second class citizen," and about Plaintiff not sufficiently supporting Ms. Makan and retaliating against her.[37] Ms. Hammons felt Ochsner had not properly trained Plaintiff to be a supervisor.[38] Accordingly, in connection with the coaching plan, Plaintiff was counseled on professionalism and emotional intelligence, leadership, and communication.[39] Ms. Hammons began meeting with Plaintiff biweekly to provide her with supervisory coaching to help her be more successful as a leader.[40] Plaintiff had

---

[30] R. Doc. 22-1 at p. 3, ¶ 19; R. Doc. 40 at p. 3, ¶ 19.
[31] R. Doc. 22-1 at p. 4, ¶ 20; R. Doc. 40 at p. 3, ¶ 20.
[32] R. Doc. 22-1 at p. 4, ¶ 20; R. Doc. 40 at p. 3, ¶ 20.
[33] R. Doc. 22-1 at p. 5, ¶ 31; R. Doc. 40 at p. 5, ¶ 31.
[34] R. Doc. 22-1 at p. 5, ¶ 32; R. Doc. 40 at p. 5, ¶ 32.
[35] R. Doc. 22-1 at p. 6, ¶ 33; R. Doc. 40 at p. 5, ¶ 33.
[36] R. Doc. 22-1 at p. 6, ¶¶ 33, 34; R. Doc. 40 at p. 5, ¶¶ 33, 34.
[37] R. Doc. 22-1 at p. 6, ¶ 36; R. Doc. 40 at p. 5, ¶ 36.
[38] R. Doc. 22-1 at p. 6, ¶ 34; R. Doc. 40 at p. 5, ¶ 34.
[39] R. Doc. 22-1 at p. 6, ¶ 35; R. Doc. 40 at p. 5, ¶ 35.
[40] R. Doc. 22-1 at p. 6, ¶ 37; R. Doc. 40 at p. 5, ¶ 37.

follow-up meetings with Ms. Hammons about the coaching plan weekly or every other week, and Dr. Roberts occasionally joined those meetings.[41]

In October 2020, Plaintiff sought additional accommodation under the ADA, which was communicated by Sun Life to Dr. Roberts as a request to work from home for two months.[42] Dr. Roberts explained to Sun Life that Ochsner could not accommodate two months of fully remote work, given staffing shortages, the demands of Plaintiff's position, and the research studies taking place in the Ochsner Kenner research department, among other reasons.[43] On October 21, 2020, Dr. Roberts informed Plaintiff via email that Ochsner could not accommodate two months of fully remote work, and Dr. Roberts asked Plaintiff to schedule some time to discuss alternative accommodations.[44] In response, Plaintiff clarified in an email that she was not seeking two months of working fully remote, but rather, was seeking an accommodation to work remotely as needed due to treatments or complications.[45] Dr. Roberts responded to Plaintiff's email re-urging his request for a meeting.[46]

On October 26, 2020, Dr. Roberts and Ms. Hammons met with Plaintiff to discuss, among other items, her accommodation request.[47] Dr. Roberts and Ms. Hammons communicated to Plaintiff, in an email sent by Ms. Hammons, that Ochsner "will accommodate to the degree possible her need to work remotely. If work demands exceed [Plaintiff's] ability to be present, or she is not able to perform her duties [Ochsner] will work with Sun Life to address the situation."[48] Plaintiff acknowledges Ms. Hammons

---

[41] R. Doc. 22-1 at p. 6, ¶ 39; R. Doc. 40 at p. 6, ¶ 39.
[42] R. Doc. 22-1 at p. 7, ¶ 41; R. Doc. 40 at p. 6, ¶ 41.
[43] R. Doc. 22-1 at p. 7, ¶ 42; R. Doc. 40 at p. 6, ¶ 42.
[44] R. Doc. 22-1 at p. 7, ¶ 44; R. Doc. 40 at p. 6, ¶ 44.
[45] R. Doc. 22-1 at p. 7, ¶ 45; R. Doc. 40 at p. 6, ¶ 45.
[46] R. Doc. 22-1 at p. 7, ¶ 46; R. Doc. 40 at p. 6, ¶ 46.
[47] R. Doc. 22-1 at p. 8, ¶ 48; R. Doc. 40 at p. 6, ¶ 48.
[48] R. Doc. 22-1 at p. 8, ¶ 49; R. Doc. 40 at p. 6, ¶ 49.

email accurately reflected what was discussed during the October 26, 2020 meeting.[49] Regarding necessary time off for medical treatments, Plaintiff and Dr. Roberts reached an agreement that Ochsner would continue to accommodate her and only requested that Plaintiff share with Ochsner any planned absences.[50]

Also in October 2020, Plaintiff became aware that Ms. Wendt had complained to human resources that Plaintiff sent Ms. Wendt a series of text messages and pictures that Ms. Wendt thought were inappropriate.[51] Specifically, on August 10, 2020, after Ms. Wendt had not responded to Plaintiff's non-work-related text messages for six days, Plaintiff texted Ms. Wendt "Since you don't care about me anymore I'll just spam you with shit."[52] Plaintiff then texted Ms. Wendt six pictures of Plaintiff exposed from the waist up and posing in different positions.[53] Plaintiff followed the pictures with "Fat AF but loving my new small boobs! I'll be back Monday. So better start talking to me again."[54]

On October 20 and 22, 2020, Ms. Wendt reached out to Ms. Leone, an Ochsner human resources representative, via Facebook message about what would happen "if a member of leadership texted you inappropriate pictures that made you feel uncomfortable."[55] After Ms. Wendt reached out to Ms. Leone via Facebook, Ms. Leone and Ms. Wendt spoke by phone on October 26, 2020, and Ms. Wendt described the pictures and reported they made her feel uncomfortable.[56] Ms. Leone learned that Plaintiff claimed she and Ms. Wendt had a personal friendship, but that was not an important part of her investigation, as Ms. Wendt complained to Ms. Leone of sexual

---

[49] R. Doc. 22-1 at p. 8, ¶ 50; R. Doc. 40 at p. 6, ¶ 50.
[50] R. Doc. 22-1 at p. 8, ¶ 51; R. Doc. 40 at p. 6, ¶ 51.
[51] R. Doc. 22-1 at p. 8, ¶ 52; R. Doc. 40 at p. 6, ¶ 52.
[52] R. Doc. 22-1 at p. 9, ¶ 53; R. Doc. 40 at p. 6, ¶ 53.
[53] R. Doc. 22-1 at p. 9, ¶ 54; R. Doc. 40 at p. 7, ¶ 54.
[54] R. Doc. 22-1 at p. 9, ¶ 55; R. Doc. 40 at p. 7, ¶ 55.
[55] R. Doc. 22-1 at p. 10, ¶ 59; R. Doc. 40 at p. 8, ¶ 59.
[56] R. Doc. 22-1 at p. 10, ¶ 60; R. Doc. 40 at p. 8, ¶ 60.

harassment by a supervisor.[57] Ms. Leone considered Ms. Wendt's delay in reporting the text messages and asked Ms. Wendt to explain the delay in reporting.[58] Ms. Wendt reported the delay was due to fear of retaliation.[59] After conducting her initial investigation, Ms. Leone informed Dr. Roberts that Ms. Wendt reported being highly uncomfortable, had been harassed, and was in an unsafe work environment.[60]

Plaintiff was terminated on October 30, 2020.[61] Dr. Roberts made the ultimate decision to terminate Plaintiff's employment, after consulting with Ms. Leone.[62] Dr. Roberts and Ms. Leone met with Plaintiff on October 30, 2020, four days after Ms. Leone first reviewed the text messages, to confirm whether the messages were sent intentionally and ultimately to inform Plaintiff that her employment was being terminated.[63] Plaintiff acknowledged the stated reason for termination was Plaintiff's failure to adhere with Ochsner's Anti-Harassment policy.[64] Ochsner's Anti-Harassment Policy is "intended to communicate that inappropriate behavior that demonstrates Harassment . . . against others in any form is unacceptable and will not be tolerated."[65] The policy defines "Harassment" as, among other actions, "[o]ffensive physical actions, written or spoken, and graphic communication."[66] Plaintiff acknowledged that Ochsner should not ignore its policies simply because of Plaintiff's friendship with Ms. Wendt.[67] Dr. Roberts testified that any information regarding Plaintiff's relationship with Ms. Wendt was not relevant

---

[57] R. Doc. 22-1 at p. 10, ¶ 61; R. Doc. 40 at p. 8, ¶ 61 (admitting in substance).
[58] R. Doc. 22-1 at p. 10, ¶ 62; R. Doc. 40 at p. 8, ¶ 62.
[59] R. Doc. 22-1 at p. 10, ¶ 63; R. Doc. 40 at p. 8, ¶ 63.
[60] R. Doc. 22-1 at p. 10, ¶ 64; R. Doc. 40 at p. 8, ¶ 64 (admitting in substance that Ms. Leone informed Dr. Roberts of these things and that Ms. Wendt reported the same).
[61] R. Doc. 22-1 at p. 10, ¶ 65; R. Doc. 40 at p. 8, ¶ 65.
[62] R. Doc. 22-1 at p. 11, ¶ 66; R. Doc. 40 at p. 8, ¶ 66.
[63] R. Doc. 22-1 at p. 11, ¶ 67; R. Doc. 40 at p. 8, ¶ 67.
[64] R. Doc. 22-1 at p. 11, ¶ 66; R. Doc. 40 at p. 8, ¶ 66; *see also* R. Doc. 22-1 at p. 12, ¶ 74; R. Doc. 40 at p. 9, ¶ 74 (admitting in substance).
[65] R. Doc. 22-1 at p. 11, ¶ 69; R. Doc. 40 at p. 9, ¶ 69 (admitting in substance).
[66] R. Doc. 22-1 at p. 11, ¶ 70; R. Doc. 40 at p. 9, ¶ 70.
[67] R. Doc. 22-1 at p. 12, ¶ 72; R. Doc. 40 at p. 9, ¶ 72.

to Ms. Wendt's complaint.[68] Plaintiff could not identify any other Ochsner employee who violated Ochsner's Anti-Harassment Policy who was not terminated.[69]

## II.    Disputed Facts

Plaintiff argues Defendant's motion for partial summary judgment should be denied because disputed issues of material fact exist. First, the parties dispute whether Ochsner interfered with or gave Plaintiff "trouble" with her accommodation of ADA-protected leave. Ochsner contends it is undisputed that "[n]o one ever interfered with or gave Plaintiff trouble with her using her accommodation of ADA-protected leave" and "[b]oth before and after her FMLA leave for her double mastectomy procedure, Plaintiff utilized an accommodation of ADA-protected intermittent leave as needed and without interference to attend appointments and receive treatment for breast cancer."[70] In terms of evidence, Ochsner relies on Plaintiff's deposition testimony.[71] By contrast, Plaintiff argues she was retaliated against for initially taking leave because of her disability and need for treatment and ultimately terminated because of her cancer—in fact, Plaintiff contends she was told to come back early from her medical leave because of Ochsner's efforts to participate in COVID vaccine clinical trials.[72] In terms of evidence, Plaintiff relies on her deposition testimony and her human resources complaint file.[73]

Second, the parties dispute when Samantha Bright called Plaintiff to ask her to return to work early. Relying on Plaintiff's deposition testimony,[74] Ochsner contends it is undisputed that Ms. Bright called Plaintiff, if she did at all, roughly a week before Plaintiff

---

[68] R. Doc. 22-1 at p. 12, ¶ 73; R. Doc. 40 at p. 9, ¶ 73 (admitting in substance).
[69] R. Doc. 22-1 at p. 12, ¶ 75; R. Doc. 40 at p. 9, ¶ 75 (admitting in substance).
[70] R. Doc. 22-1 at p. 3, ¶ 15 and p. 5, ¶ 30.
[71] R. Doc. 22-3 at pp. 69-70.
[72] R. Doc. 40 at p. 2, ¶ 15 and p. 5, ¶ 30.
[73] R. Doc. 22-3 at pp. 55-56; *see also* R. Doc. 31-2.
[74] R. Doc. 22-3 at p. 55.

returned to work.[75] By contrast, also relying on Plaintiff's deposition testimony, Plaintiff argues Ochsner misstates the evidence on which it relies because Plaintiff testified "I – maybe I came back, like, a week later. I told her, let me see what my doctor says if you guys really need me. I felt pressured from her to come back early; let me see what my doctors say, and I'll let you know."[76] Plaintiff contends this evidence only establishes Plaintiff did not recollect the exact date of Ms. Bright's phone call.[77]

Third, the parties dispute why Plaintiff returned to work early in August 2020. Relying on Plaintiff's deposition testimony and text messages,[78] Ochsner contends it is undisputed that Plaintiff returned to work at the six-week mark of her eight-week leave because Plaintiff was bored at home.[79] Relying on her deposition testimony and human resources complaint file,[80] Plaintiff contends she returned to work not only because she was bored at home, but also because she was asked to return to work by Ms. Bright and feared retaliation and discrimination if she did not acquiesce.[81]

Fourth, the parties dispute whether Ms. Bright was Plaintiff's supervisor. Relying on Plaintiff's deposition testimony,[82] Ochsner contends it is undisputed that Ms. Bright was not Plaintiff's supervisor at the time of the call.[83] By contrast, relying on the deposition of Dr. Roberts and Ms. Leone,[84] as well as Plaintiff's human resources complaint file,[85] Plaintiff contends the departure of multiple Ochsner leaders in summer

---

[75] R. Doc. 22-1 at p. 4, ¶ 21.
[76] R. Doc. 22-3 at pp. 55-57.
[77] R. Doc. 40 at p. 3, ¶ 21.
[78] R. Doc. 22-3 at pp. 57-59, 61; R. Doc. 22-5.
[79] R. Doc. 22-1 at ¶¶ 22-27.
[80] R. Doc. 22-3 at pp. 55, 58-62; *see also* R. Doc. 31-2.
[81] R. Doc. 40 at ¶¶ 22-27.
[82] R. Doc. 22-3 at pp. 35, 72-73.
[83] R. Doc. 22-1 at ¶¶ 28.
[84] R. Doc. 22-12 at p. 8; R. Doc. 22-16 at p. 37.
[85] R. Doc. 31-2.

2020 disrupted the structure of supervision and Ms. Bright was one of Plaintiff's supervisors when Plaintiff returned from leave in August 2020.[86]

Fifth, the parties dispute the motivations for Ochsner's implementation of a coaching plan in September 2020. Ochsner contends it is undisputed that a coaching plan was implemented as a result of complaints made by Ms. Makan.[87] Pointing to the deposition testimony of Ms. Leone and Ms. Hammons,[88] Plaintiff argues it is disputed "that the sole motivation for implementing the coaching plan was to address Deepika's remarks" as the coaching plan-related "[m]eetings . . . devoted significant time discussing other allegations against plaintiff" and "continued for weeks after Ms. Makan left her job at Ochsner."[89]

Sixth, the parties dispute whether Plaintiff acknowledged that her position was not one that could be performed in a fully remote capacity. Ochsner contends it is undisputed that Plaintiff "acknowledged . . . her position was not one that could be performed in a fully remote capacity," citing her deposition testimony.[90] Plaintiff denies this is undisputed because the deposition testimony relied on by Ochsner only stands for the proposition that "Plaintiff acknowledged . . . certain positions in research were only very rarely performed remotely and that certain positions required certain amounts of in person work."[91]

Seventh, the parties dispute whether Ms. Wendt felt uneasy when she was sent the photographs of Plaintiff's exposed chest on August 10, 2020. Citing Ms. Wendt's

---

[86] R. Doc. 40 at ¶ 28.
[87] *See generally* R. Doc. 22-2 at ¶ 35.
[88] R. Doc. 22-16 at pp. 38-41; R. Doc. 22-15 at pp. 39-41.
[89] R. Doc. 40 at ¶ 35.
[90] R. Doc. 22-2 at ¶ 43 (citing R. Doc. 22-3 at pp. 43-44).
[91] R. Doc. 40 at ¶ 43 (citing R. Doc. 22-3 at pp. 43-44).

deposition testimony,[92] Ochsner contends it is an undisputed fact that, when Ms. Wendt received the photographs, she felt uneasy and uncomfortable because she had never seen Plaintiff fully topless before, and had only ever seen photographs of incisions when Plaintiff asked medical questions within Ms. Wendt's expertise.[93] Relying on evidence to establish the nature of Plaintiff's and Ms. Wendt's friendship, Plaintiff argues Ms. Wendt did not feel harassed or offended by the photographs.[94]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[95] "An issue is material if its resolution could affect the outcome of the action."[96] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[97] All reasonable inferences are drawn in favor of the non-moving party.[98] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[99]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[100] If the

[92] R. Doc. 22-13 at p. 56.
[93] R. Doc. 22-2 at p. 9, ¶ ¶¶ 56-58.
[94] R. Doc. 40 ¶¶ 56-58.
[95] FED. R. CIV. P. 56. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[96] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[97] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[98] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[99] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[100] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).

moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[101]

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, as in this case, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim.[102] If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied.[103] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[104] "[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[105]

---

[101] *Celotex*, 477 U.S. at 322–24.

[102] *Id*. at 331–32 (Brennan, J., dissenting).

[103] *See id*. at 332.

[104] *Id*. at 332–33. The burden would then shift back to the movant to demonstrate the inadequacy of the evidence relied upon by the non-movant. Once attacked, "the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id*. at 332–33, 333 n.3.

[105] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

<u>**LAW AND ANALYSIS**</u>

Defendant moves for summary judgment on five of Plaintiff's claims: (1) her discrimination claim under the ADA; (2) her retaliation claim under the ADA; (3) her retaliation claim under the FMLA; (4) her failure to accommodate claim under the ADA; and (5) one of her interference claims under the FMLA.[106] The Court addresses Defendant's arguments below.

## I.    Ochsner is not entitled to summary judgment on Plaintiff's ADA discrimination claim.

Under the ADA, a covered employer "shall [not] discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[107] A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[108] "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[109]

When an ADA plaintiff relies upon circumstantial evidence, the Court applies the traditional *McDonnell Douglas* burden-shifting analysis.[110] In this case, both parties apply the *McDonnell Douglas* burden shifting analysis. Accordingly, for the purpose of resolving the instant motion, the Court assumes this is a circumstantial evidence case. "To

---

[106] R. Doc. 22.
[107] 42 U.S.C. § 12112(a).
[108] 42 U.S.C. § 12111(8).
[109] 42 U.S.C. § 12102(2)(A)-(C).
[110] *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir.2000).

establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability."[111] "Once the plaintiff makes his prima facie showing, the burden [of production] … shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."[112] If the defendant-employer carries its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative)."[113] A reason is pretextual if it is false, "unworthy of credence," or otherwise unpersuasive.[114]

### A.    Prima Facie Showing of ADA Discrimination

For the purpose of the instant Motion for Summary Judgment, Defendant agrees Plaintiff can satisfy the first two elements of a prima facie ADA discrimination claim but argues there is "no evidence that [Plaintiff's] disability [of cancer] was causally connected to the only adverse employment action she experienced, her termination," *i.e.*, Plaintiff cannot satisfy the third element.[115] In opposition, Plaintiff concedes her disability is cancer and that the only adverse employment action she experienced was termination.[116] However, Plaintiff argues that she can satisfy the prima facie causation requirement because, *inter alia*, there is close temporal proximity between Plaintiff's request for

---

[111] *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

[112] *See McInnis*, 207 F.3d at 280.

[113] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312–13 (5th Cir.2004) (citations and internal quotation marks omitted).

[114] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

[115] R. Doc. 22-2 at p. 20.

[116] R. Doc. 31 at pp. 10-11.

accommodations on October 16, 2020, on account of her disability and her October 30, 2020 termination.[117]

The Court finds *Evans v. East Baton Rouge Parish School Board* persuasive in its analysis. In *Evans*, a school teacher sued the East Baton Rouge Parish School Board, bringing claims for alleged violations of the ADA and FMLA.[118] The school board moved for summary judgment on, *inter alia*, the teacher's ADA discrimination claim arguing there was no genuine dispute of material fact with respect to the element of causation.[119] Relying on cases from the Fifth Circuit, the district court disagreed, finding that a close temporal proximity existed between the teacher's request for accommodations on account of his disability in June 2017 and his termination on August 16, 2017.[120]

Applying the reasoning of *Evans* to the case at bar, Plaintiff can show close temporal proximity between at least one of her requests for accommodations on account of her disability and the adverse employment action she suffered. Specifically, and even by Ochsner's own telling, "[i]n October of 2020, Plaintiff sought additional accommodation under the ADA, which was communicated . . . to [Ochsner]."[121] This request was made on October 16, 2020, due to Plaintiff's disability.[122] "Plaintiff was subsequently terminated on October 30, 2020."[123] Thus, a 14-day gap in time exists between this request for accommodations on account of Plaintiff's disability and her subsequent termination. A reasonable jury, on account of close proximity, could infer

---

[117] *Id.* at p. 11.
[118] 2022 WL 698062, at *1 (M.D. La. 3/8/2022) (Dick, J.).
[119] *Id.* at *9.
[120] *Id.*
[121] R. Doc. 22-2 at p. 11.
[122] *Id.* ("due to treatments or complication"); *see also* R. Doc. 22-6 at p. 4.
[123] R. Doc. 22-2 at p. 15.

causation. Accordingly, viewing the evidence in the light most favorable to the non-moving party, Plaintiff has presented a prima facie case of retaliation.[124]

### B.  Burden Shifts to Defendant to Proffer Reasons for the Adverse Employment Action

When a plaintiff establishes a prima facie claim of retaliation, the burden shifts to the employer. The employer must merely articulate a legitimate, nondiscriminatory reason for its employment action.[125] In this case, Defendant articulates Plaintiff's termination was for one reason:

> Plaintiff's employment was terminated for a legitimate, non-discriminatory reason—namely, her violation of Ochsner's Anti-Harassment policy by sending unwelcomed pictures of her exposed upper body to her subordinate, Ms. Wendt, in an effort to spam her. Specifically, Plaintiff had sent her subordinate Ms. Wendt numerous, non-work related texts to which Ms. Wendt had not responded. Plaintiff then stated [in a text], "[s]ince you don't care about me anymore, I'll just spam you with shit," followed by the unwelcomed photos. . . . [in which] Plaintiff was posing in various ways to show off her exposed breasts.[126]

"The employer's burden is only one of production, not persuasion, and involves no credibility assessment."[127] Defendant has articulated a neutral reason for its termination of Plaintiff and, accordingly, has met its burden of production. "The employee must [now] present evidence that the articulated reason is pretextual."[128]

### C.  Burden Shifts to Plaintiff to Demonstrate Defendant's Reason for the Adverse Employment Action Is Pretext for Discrimination

"In response to a motion for summary judgment, an employee must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for

---

[124] *Lyons v. Katy Independent School Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (internal quotation omitted)).
[125] *Id.*
[126] R. Doc. 22-2 at p. 21.
[127] *McCoy v. Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).
[128] *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 479 (5th Cir. 2016).

termination is pretextual."[129] "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"[130]

There is a genuine dispute of material fact as to whether Ochsner's proffered explanation is worthy of credence. Defendant contends it fired Plaintiff because she violated Ochsner's Anti-Harassment Policy when she texted post-surgery photographs to her subordinate April Wendt on August 10, 2020.[131] April Wendt reported the texts on October 20, 2020, to an Ochsner human resources representative through the social media site Facebook.[132] In so doing, April Wendt reported to Ochsner the photographs made her uncomfortable.[133] Ochsner then conducted an investigation. Ten days later, Plaintiff's employment was terminated.[134] To justify its decision, Ochsner points to the portion of the Anti-Harassment Policy that defines "[h]arassment as, among other actions, . . . '[o]ffensive physical actions, written or spoken, and graphic communication (e.g.[,] obscene hand or finger gestures of sexually explicit drawings).'"[135]

By contrast, Plaintiff's theory is that Plaintiff did not violate Ochsner's Anti-Harassment Policy,[136] Ochsner failed to conduct a proper investigation into April Wendt's report initially communicated via Facebook,[137] and Ochsner truthfully terminated Plaintiff's employment—as the supervisor of clinical trials—on account of her need for intermittent remote work and other future accommodations requests due to her disability

---

[129] *Id.* at 480.
[130] *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001))).
[131] R. Doc. 22-2 at p. 13.
[132] *Id.* at p. 14.
[133] *Id.*
[134] R. Doc. 22-2 at p. 10, ¶ 65.
[135] *Id.* at p. 16.
[136] R. Doc. 31 at p. 7.
[137] *Id.*

given the increased pressure on the healthcare system during the COVID-19 pandemic and Ochsner's role as a site for a COVID-19 vaccination clinical trial.[138] Simply, Plaintiff argues Ochsner was fed up with her requests for accommodation and FMLA leave, and Ms. Wendt's report was a welcomed opportunity to terminate Plaintiff's employment.

In terms of evidence that Plaintiff did not violate the Anti-Harassment Policy, Plaintiff points to deposition testimony to dispute whether the photographs were "offensive," as that word is used in Ochsner's Anti-Harassment Policy, given the context of Plaintiff's friendship with April Wendt. As a sample, April Wendt testified she had a personal friendship with Plaintiff and they regularly texted each other.[139] Indeed, they were close enough friends that April Wendt accompanied Plaintiff to cancer treatments and was listed as an agent on Plaintiff's medical power of attorney for healthcare decisions.[140] April Wendt testified that she felt "fine" when Plaintiff made a Facebook post thanking April Wendt for serving as her "personal nurse" throughout her chemotherapy treatments.[141] Ms. Wendt regularly answered Plaintiff's medical questions over the phone and via text. Sometimes, a question texted to Ms. Wendt included a picture of Plaintiff's incisions near her upper chest, which April Wendt testified in her deposition she did not find intrusive.[142] Plaintiff testified that, at around the time Ms. Wendt reported her concerns to a human resources representative over Facebook on October 20, 2020, about photographs she received two months earlier, Plaintiff was "having performance issues with" Ms. Wendt and "having tough conversations with her" about her work.[143] Along those lines, on October 12, 2020, Ms. Wendt texted Plaintiff as follows:

---

[138] *Id.* at p. 13.
[139] *See* R. Doc. 22-13 at pp. 30-31.
[140] *See id.* at pp. 35, 36, 37, 39
[141] *Id.* at p. 44.
[142] *Id.* at p. 52.
[143] R. Doc. 22-3 at p. 141.

> I don't hate you if ur worried about that. I just don't like being lied to & don't like being thrown under the bus. I don't do that to people I call friends. I don't like feeling like I get told 1 thing & you tell others different stories. If I can't trust anything you say then we will have problems.
>
> That last sentence was not a threat, fyi.[144]

All of this to say, though Ochsner contends "[t]he photographs and text messages Plaintiff sent Ms. Wendt speak for themselves and clearly violated Ochsner's anti-harassment policy,"[145] the Court cannot step into the shoes of the jury to resolve the issue of whether the photographs were "offensive" in light of the context of Plaintiff's friendship with Ms. Wendt.

In terms of evidence that Ochsner failed to conduct a proper investigation, the Court finds Dr. Mark Roberts' testimony relevant here. Dr. Roberts, who is the dean at Ochsner that decided to terminate Plaintiff's employment,[146] testified in his deposition that an investigation of a relatively similar report of an alleged "uncomfortable" exchange of photographs might involve taking statements from other co-workers to understand the context of the communication and looking at the history of the relationship of the two employees to give further context to those communications.[147] As Ochsner concedes, the human resources representative who led the investigation, Lara Leone, found the personal friendship between Plaintiff and Ms. Wendt "was not an important part of [the] investigation."[148] On this basis, the Court finds there exists a genuine dispute of material fact as to whether the investigation conducted was proper—even as defined by Ochsner's decisionmakers.

---

[144] R. Doc. 40-6 at p. 159.

[145] R. Doc. 44 at p. 7.

[146] Ochsner also contends Lara Leone was a relevant decision maker. R. Doc. 44 at p. 6.

[147] R. Doc. 22-12 at pp. 35-36.

[148] *Id.* at p. 14.

In terms of evidence that Ochsner in reality terminated Plaintiff's employment because Plaintiff needed to work remotely intermittently and would likely need future accommodations on account of her disability, Plaintiff points to evidence of the increased pressure on the healthcare system during the COVID-19 pandemic and Ochsner's role as a site for a COVID-19 vaccination clinical trial. Dr. Roberts testified "[t]he complexity around being a potential site [for the COVID-19 vaccine clinical trial] was very substantial"[149] and that it was "imperative for [Plaintiff] to physically be present" given "the work of a clinical research supervisor."[150] Dr. Roberts also testified he had some knowledge of Plaintiff's medical status and potential need for future accommodations.[151]

With all of that context, in addition to the close temporal proximity between Plaintiff's request for intermittent remote work and termination, Plaintiff contends a reasonable jury could find Ochsner's proffered explanation is pretext for discrimination. The Court agrees. The Court finds, with respect to the reason stated by Defendant for terminating Plaintiff, Plaintiff has shown there is a conflict in substantial evidence that casts into doubt the credence of Ochsner's stated reason. The jury must weigh the credibility of the evidence to resolve the factual disputes outlined above. If Plaintiff's position is proven, a reasonable jury could infer discrimination was the real motive for Plaintiff's termination. Accordingly, Defendant's Motion for Summary Judgment must be denied on Plaintiff's claim of disability discrimination under the ADA.

---

[149] R. Doc. 22-12 at p. 15.
[150] *Id.* at p. 19. While the Court is cognizant that Dr. Roberts also testified he "was willing to find ways to have [Plaintiff] work a portion of the time remotely," the Court finds such testimony may be incompatible with his testimony that Plaintiff's job could not be done remotely. The jury must resolve such conflict.
[151] *Id.* at pp. 17-20.

## II.     Ochsner is not entitled to summary judgment on Plaintiff's ADA retaliation claim.

Plaintiff brings an ADA retaliation claim against Ochsner. In order to establish a prima facie case of retaliation under the ADA, a plaintiff must show, at trial, that:

> (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation.[152]

For purposes of summary judgment, Defendant agrees Plaintiff can establish a prima facie case of ADA retaliation.[153] Defendant only disputes whether Plaintiff can create a genuine dispute of material fact that the stated reason for Plaintiff's termination, violating the Anti-Harassment Policy, was pretext for retaliation for "Plaintiff engag[ing] in activity protected by the ADA when she requested accommodation via Sun Life in October 2020."[154] The Court's has found, *supra*, there is a genuine dispute of material fact as to whether Ochsner terminated Plaintiff's employment because Plaintiff, *inter alia*, needed to work remotely intermittently (*i.e.*, on account of the October 2020 request to Sun Life). Accordingly, Defendant's Motion for Summary Judgment must be denied on Plaintiff's claim of retaliation under the ADA.

## III.    Ochsner is not entitled to summary judgment on Plaintiff's FMLA retaliation claim.

Plaintiff brings a claim for FMLA retaliation, arguing that she was terminated by Ochsner in retaliation for taking and requesting FMLA leave. "Retaliation claims for

---

[152] *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). This is the *McDonnell Douglas* burden shifting framework.
[153] R. Doc. 22-2 at pp. 24-25.
[154] *Id.* at p. 24.

exercising FMLA rights are subject to the *McDonnell Douglas* burden-shifting framework."[155] To make a prima facie case, "the employee must show that '(1) he engaged in a protected activity, (2) the employer discharged him, and (3) there is a causal link between the protected activity and the discharge.'"[156] Then, as the Fifth Circuit has explained it,

> If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to provide a 'legitimate, non-discriminatory reason for the employment decision.' If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the burden returns to the plaintiff, who must then be afforded an opportunity to rebut the employer's purported explanation with evidence that the reason given is merely pretextual.[157]

As with Plaintiff's ADA discrimination and retaliation claims, both parties in this case apply the *McDonnell Douglas* burden shifting analysis. Accordingly, for the purpose of resolving the instant motion, the Court assumes this is a circumstantial evidence case.

For the purpose of summary judgment, "Ochsner does not dispute that Plaintiff engaged in protected activity when taking FMLA leave from July 1-August 17, 2020, or when she sought FMLA leave in October 2020 for her upcoming hysterectomy surgery in December."[158] Defendant argues summary judgment is appropriate for two reasons: (1) Plaintiff cannot make a prima facie case for FMLA retaliation because "there is no evidence of any causal connection between Plaintiff's July-August FMLA leave and her termination over two months after she returned from leave, as the sole cause for Plaintiff's termination was her violation of Ochsner's anti-harassment policy;"[159] and (2) if she can

---

[155] *Amedee v. Shell Chemical, L.P.*, 953 F.3d 831, 835 (5th Cir. 2020).
[156] *Id.* (quoting *Tatum v. S. Co. Servs.*, 930 F.3d 709, 713 (5th Cir. 2019) (alterations omitted)).
[157] *Garcia v. Penske Logistics, L.L.C.*, 631 Fed.Appx. 204, 210 (5th Cir. 2015) (internal citations omitted).
[158] R. Doc. 22-2 at p. 28.
[159] *Id.* Notably, Defendant does not argue Plaintiff cannot establish a causal connection between Plaintiff's termination and her request for FMLA leave in October 2020 for her upcoming hysterectomy surgery. *See id.*

establish prima facie retaliation, "summary judgment is appropriate for the same reasons as discrimination and retaliation under the ADA," *i.e.*, because there is no evidence of pretext.[160]

With respect to Ochsner's first argument, Plaintiff is entitled to rely on close temporal proximity, meaning there is "evidence of a[] causal connection between Plaintiff's July-August FMLA leave and her termination"[161] on October 30, 2020.[162] The Fifth Circuit measures temporal proximity from the last day of an employee's FMLA leave until the adverse employment action at issue occurs.[163] Thus, the Court must decide whether there is sufficiently close temporal proximity between August 17, 2020 (the end of Plaintiff's July to August FMLA leave) and October 30, 2020 (the day Plaintiff was terminated)—approximately two and a half months. There exists no hard-and-fast rule to determine how much of a gap in time between the protected activity and adverse employment action is too much time. The Fifth Circuit has held a period of two and one-half months between the protected activity and the adverse employment action may be enough to enable a reasonable jury to infer causation.[164] In a different case, the Fifth Circuit held nearly three months was not within the very close proximity that is necessary to establish causation.[165] These differing outcomes reveal the fact-intensive nature of the inquiry involved in determining whether a plaintiff may rely upon temporal proximity to establish prima facie causation. Accordingly, the Court finds that a reasonable jury, on account of close proximity, could infer causation between Plaintiff's protected activity of taking FMLA leave from July to August and her termination in October.

---

[160] *Id.* at pp. 28-29.
[161] *Id.* at p. 28.
[162] R. Doc. 31 at p. 11.
[163] *Amsel v. Texas Water Dev. Bd.*, 464 Fed.Appx. 395, 401-02 (5th Cir. 2013).
[164] *Richard v. Cingular Wireless, LLC*, 233 Fed.Appx. 334, 338 (5th Cir. 2007).
[165] *Amsel*, 464 Fed.Appx. 401-02.

With respect to Ochsner's second argument, the Court's has found, *supra*, there is a genuine dispute of material fact as to whether Ochsner's stated reason for termination is pretext for discrimination and retaliation. Accordingly, Defendant's argument that "summary judgment is appropriate for the same reasons as discrimination and retaliation under the ADA," *i.e.*, because there is no evidence of pretext, fails.[166] Ochsner is not entitled to summary judgment on Plaintiff's FMLA retaliation claim.

## IV. Ochsner is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

Plaintiff brings an ADA failure to accommodate claim against Ochsner. The ADA prohibits an employer from discriminating against a "qualified individual with a disability on the basis of that disability."[167] The Act defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."[168] The statute also allows for suits by plaintiffs who, though not actually disabled as the Act defines that word, are "regarded as having such an impairment."[169] A "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.[170]

Discrimination under the ADA includes "not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would

---

[166] R. Doc. 22-2 at pp. 28-29. The Court has considered and hereby rejects Defendant's additional arguments that Plaintiff cannot show pretext because (1) Ochsner allowed Plaintiff to take FMLA leave throughout her employment and (2) Plaintiff testified in her deposition no one ever made any negative comments or suggestions regarding her taking of FMLA leave. *Id.* The parties concede this is a circumstantial evidence case, and Ochsner's arguments miss this point.

[167] *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).

[168] 42 U.S.C. § 12102(1)(A).

[169] *Id.* § 12102(1)(C).

[170] 42 U.S.C. § 12111(8).

impose an undue hardship on the operation of the business of such covered entity."[171] This type of ADA discrimination claim is referred to as a "failure to accommodate" claim. The elements of an ADA failure to accommodate claim are that (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the employer; and (3) the employer failed to make (denied) reasonable accommodations for such known limitations.[172]

Notably, the enumerated elements above do not include proof of an adverse employment action, such as a demotion or a termination—an adverse employment action of this nature is not a required element of an ADA failure to accommodate claim. Rather, a failure to accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question has not suffered an adverse employment action.[173] The "adverse" conduct by the employer that triggers an ADA failure to accommodate claim is the employer's denial of the employee's reasonable accommodation request.[174]

The "reasonableness" of the requested accommodation is a crucial part of the plaintiff's prima facie case and therefore she bears the burden of proof at trial as to reasonableness.[175] In making a reasonable accommodation the ADA requires employers to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that

---

[171] *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020) (citing § 12112(b)(5)(A) (emphasis added)).
[172] *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021).
[173] *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014).
[174] *See Windhauser v. Board of Supv. for La. State Univ.*, 360 Fed. Appx. 562, 566 (5th Cir. 2010).
[175] *Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996).

position . . . ."[176] But "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so."[177]

An implicit requirement of the plaintiff's prima facie case for a failure to accommodate claim is that she demonstrates she actually requested the accommodation that she claims to have been denied. Thus, at trial, the plaintiff must demonstrate not only that the accommodation at issue is reasonable but also that she requested it.[178] After all, if the employee fails to request an accommodation the employer cannot be held liable for failing to provide it.[179]

Assuming the plaintiff has satisfied all of the elements of her prima facie case for the failure to accommodate, the burden then shifts to the employer to demonstrate that the requested reasonable accommodation would impose an undue hardship on the operation of the employer's business.[180] The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of factors such as the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.[181]

With these precepts in mind, the Court now turns to the three required elements of an ADA failure to accommodate claim: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the

---

[176] *LHC Grp.*, 773 F.3d at 698 (citing 29 C.F.R. § 1630.2(o) (1)(ii)).
[177] *Id.* (citing *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)).
[178] *Clark*, 952 F.3d at 587 (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)).
[179] *Id.* at 587 n.71 (citing *Taylor*, 93 F.3d at 165).
[180] *Chevron Phillips Chem.*, 570 F.3d at 614 (citing 42 U.S.C. § 12112(b)(5)(A)).
[181] 42 U.S.C. § 12111(10)(A)-(B)(iv).

employer; and (3) the employer failed to make (denied) reasonable accommodations for such known limitations.[182] For the purpose of summary judgment, Defendant only casts into doubt Plaintiff's ability to prove the third element.[183]

With respect to the third element, Ochsner argues the only time it denied a request for accommodations by Plaintiff was in October 2020.[184] During that month, Plaintiff made a request for a remote work accommodation, which was communicated to Ochsner by Ochsner's third party FMLA administrator, Sun Life.[185] Specifically, in an email dated October 16, 2020, Sun Life employee Casey Hatten emailed Ochsner's Dr. Mark Roberts as follows:

> Good afternoon,
>
> We have received a medically certified accommodation request for Cathryn Garvey. The employee is requesting to work from home for 2 months.
>
> Can this be accommodated?[186]

On Monday, October 19, 2020, Dr. Roberts responded to Hatten's email:

> Good afternoon:
>
> Thank you for allowing me to consult with other leaders overseeing the work at Kenner.
>
> We will not be able to accommodate the request to work remotely from Kate Garvey (Leggio). I provide reasons for this decision here:
>
> • Kate's role includes providing direct contributions to research subjects along with her site lead/supervisor role. These include:
>   o Consenting research patients into studies
>   o Phlebotomy
>   o Research subject instruction/training
>   We do not have sufficient staffing, such as an additional clinical research coordinator, at Kenner to meet the needs of currently active research projects (see below)

---

[182] *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021).
[183] R. Doc. 22-2 at pp. 17-18.
[184] *Id.* at pp. 18-19.
[185] *See* Undisputed Facts *supra*.
[186] R. Doc. 22-6 at p. 4.

- Supervising research staff remotely is very difficult given the complexity of the work
- The Kenner Janssen COVID Vaccine Study is taking place in four trailers and the Medical Office Building; two designated site leads, including Kate Garvey (Leggio), are crucial during times when all 5 locations are in use.
  - o Monitor flow, reduce bottleneck, provide guidance to patients who are lost/confused, be the go to for staff operation questions.
  - o Make changes to process or flow as deemed necessary based on observation
  This work cannot be accomplished remotely.
- Other Kenner studies are active too and the research staff under Kate is now at 50% capacity
  - o We are down a Clinical Research Coordinator (Deepika); therefore, Kate is needed to offset the FTE loss
  - o Kenner Clinical Research Nurse (April) is needed for the Janssen COVID vaccine injections which also impacts existing Kenner studies
- Kate's current Manager support under Sam Bright, Director and Dr. Roberts, Ansley Hammons, is not available to be physically present at Kenner given requirements for her work at the Baptist CTU[187]

Following his October 19, 2020 email to Sun Life's Casey Hatten, Dr. Roberts emailed Plaintiff on October 21, 2020, asking for a meeting to "discuss [her] expectations for working remotely."[188] Plaintiff responded the same day to Dr. Roberts' email, clarifying that her request for remote work is "supposed to cover if [Plaintiff] ever needed to work remotely due to treatments or complications."[189] In response, Dr. Roberts re-urged his request for a meeting to get a "sense of [Plaintiff's] needs . . . during the two month period" associated with Plaintiff's request.[190] On October 26, 2020, Dr. Roberts, Ansley Hammons, and Plaintiff met to discuss, *inter alia*, Plaintiff's request for remote work.[191] During that meeting, it was agreed Ochsner would "accommodate to the degree possible [Plaintiff's] need to work remotely."[192]

---

[187] *Id.* at p. 3.
[188] *Id.* at p. 2.
[189] *Id.* at p. 1.
[190] *Id.*
[191] R. Doc. 22-1 at p. 8, ¶ 48; R. Doc. 40 at p. 6, ¶ 48.
[192] R. Doc. 22-7 (e-mail from Ansley Hammons summarizing the October 26 meeting—the summary of which Plaintiff confirmed accurately "sums up today's huddle").

Ochsner contends, on the basis of Dr. Roberts' deposition testimony, that Dr. Roberts understood the request communicated by Sun Life on October 16, 2020, as a request for consecutive remote work for two months. After Dr. Roberts denied that request, the email exchange between Dr. Roberts and Plaintiff is best understood as Plaintiff clarifying she was actually requesting a remote work option on an as needed basis given her cancer treatments. In response to that request for periodic remote work, Ochsner contends, Dr. Roberts engaged in the interactive process by meeting with Plaintiff on October 26, 2020. Dr. Roberts testified that Plaintiff's request for remote work on an as needed basis was then approved. Indeed, all of these facts are undisputed.[193] Thus, Ochsner argues, "the only request for accommodation Dr. Roberts denied was not actually requested by Plaintiff" and points to case law holding that "[a]n implicit requirement of the plaintiff's prima facie case for failure to accommodate is that [s]he actually requested the accommodation that [s]he claims to have been denied."[194]

In opposition, Plaintiff does not dispute that she never requested two-months of consecutive remote work, nor does she point to any other instance of a failure to accommodate by Ochsner.[195] Instead, Plaintiff argues (1) "it is disputed whether Dr. Roberts perceived the request to work remotely for two months, full time, as an earnest request from Plaintiff;" and (2) "Plaintiff was not afforded the chance to engage in the interactive process to receive accommodations[] because she was fired . . . on October 30[,] 2020[,]" two weeks after her October 16, 2020 request for intermittent remote work.[196]

---

[193] *See* Undisputed Facts *supra*.
[194] R. Doc. 22-2 at pp. 17, 18-19 (internal quotations omitted).
[195] R. Doc. 31; *see also* R. Doc. 1 (Plaintiff's complaint, in which she brings a failure to accommodate claim but does not allege any specific instance where Ochsner failed to accommodate her).
[196] R. Doc. 31.

With respect to Plaintiff's first argument, *i.e.*, that there is a dispute of fact as to whether Dr. Roberts understood Sun Life's communication of Plaintiff's request to be that of a request for consecutive remote work or as needed remote work, Plaintiff offers no explanation why this dispute is material to the issue of whether she was denied a reasonable accommodation. Even if the Court accepts as true that Dr. Roberts understood Plaintiff's request as communicated by Sun Life on October 16, 2020, as a request for intermittent remote work, which request Dr. Roberts initially denied, it is undisputed that Dr. Roberts subsequently granted the accommodation. Plaintiff must create a genuine dispute of material fact that Ochsner denied her a reasonable accommodation, and Plaintiff's argument about Dr. Roberts' "perception" of the requested communicated by Sun Life does not help Plaintiff achieve that end.

With respect to Plaintiff's second argument, *i.e.*, that Plaintiff was not afforded the chance to engage in the interactive process to receive accommodations because she was fired two weeks after her October 16, 2020 request for intermittent remote work, Plaintiff conflates her failure to accommodate claim with a claim for failure to engage in the interactive process. These are two separate claims.[197] Accordingly, Plaintiff's second argument in opposition fails to create a genuine dispute of material fact that Plaintiff was denied a reasonable accommodation.

In sum, Plaintiff has presented no evidence to create a genuine dispute of material fact with respect to the third element of her failure to accommodate claim: that her employer failed to make (denied) reasonable accommodations.[198] Accordingly, Ochsner is entitled to summary judgment on this claim.

---

[197] *See Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 735 (5th Cir. 1999).
[198] *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021).

**V.    Ochsner is entitled to summary judgment on one of Plaintiff's FMLA interference claims.**

Defendant argues "Plaintiff's claim for FMLA interference [only] arises out of her own unsupported, self-serving allegation that an Ochsner employee, Samantha Bright, requested that she return to work prior to the end of her approved FMLA leave."[199] At the outset, Ochsner's contention is incorrect. While it is true Plaintiff brings an FMLA interference claim on the basis of Samantha Bright's phone call, Plaintiff also brings an FMLA interference claim on the basis of her assertions of retaliation and termination by Ochsner.[200] Accordingly, the Court finds Defendant has moved only for summary judgment with respect to Plaintiff's FMLA interference claim on the basis of Samantha Bright's phone call and will address only that claim here. Plaintiff's FMLA interference claim on the basis of retaliation and termination by Ochsner will proceed to trial.

The FMLA allows an employee to take reasonable leave for medical reasons or to care for a family member and prohibits an employer from interfering with, restraining, or denying the exercise or attempt to exercise FMLA rights.[201] To establish a prima facie interference case, at trial, Plaintiff must show (1) she was an eligible employee; (2) Defendant was an employer subject to the FMLA's requirements; (3) she was entitled to leave; (4) she gave proper notice of the intent to take FMLA leave; (5) Defendant denied the benefits to which she was entitled under the FMLA; and (6) she was prejudiced.[202] Interference claims do not require a showing of discriminatory intent.[203]

---

[199] R. Doc. 22-2 at p. 26.

[200] *See* R. Doc. 1 at p. 9, ¶ 40; R. Doc. 40 at p. 2, ¶ 15; *see also Crain v. Schlumberger Technology Co.*, 2017 WL 713673, at *2 (E.D. La. 2/23/2017) (Milazzo, J.) (recognizing the existence of an FMLA interference claim where termination of employment interfered with an employee's right to FMLA leave). The Court refrains from *sua sponte* analyzing whether Plaintiff can prevail on her interference claim on the basis of retaliation and termination.

[201] 29 U.S.C. §§ 2601, 2615.

[202] *Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 Fed.Appx. 312, 316 (5th Cir. 2013).

[203] *Jones v. Children's Hosp.*, 58 F.Supp.3d 656, 668 (E.D. La. 2014) (Morgan, J.).

For the purpose of summary judgment, Defendant concedes Plaintiff was an eligible employee (the first element), Defendant was an employer subject to FMLA's requirements (the second element), Plaintiff was entitled to leave (the third element), and Plaintiff gave proper notice of her intent to take FMLA leave (the fourth element).[204] Instead, Defendant argues Plaintiff cannot create a genuine dispute of material fact that she was denied the benefits to which she was entitled under the FMLA (the fifth element) and that Plaintiff was prejudiced (the sixth element).[205] In opposition, Plaintiff offers no argument in her briefing suggesting there is a triable issue of fact with respect to her interference claim on the basis of the Samantha Bright phone call.[206]

Be that as it may, in her amended response to Defendant's statement of uncontested material facts, Plaintiff seems to suggest there is a genuine dispute of material fact with respect to the last two elements of her FMLA interference claim calling into question the basis for Ochsner's Motion for Summary Judgment because "Plaintiff was [asked] to come back early from her medical leave because of Ochsner's efforts to participate in COVID vaccine trials."[207] In terms of evidence, Plaintiff cites to her deposition testimony, which establishes Plaintiff took FMLA leave from July 1, 2020 through August 17, 2020, for Plaintiff's "double mastectomy with lymph node dissection and expander placement."[208] Ochsner uses a third-party, Sun Life, to manage employees' requests for FMLA leave.[209] Sun Life approved Plaintiff for eight weeks of FMLA leave,

---

[204] R. Doc. 22-2 at p. 26.
[205] *Id.* at pp. 26-27.
[206] *See* R. Doc. 31 (offering no argument with respect to Plaintiff's interference claim).
[207] R. Doc. 40 at p. 2.
[208] R. Doc. 22-3 at p. 54.
[209] *Id.* at p. 52.

but Plaintiff came back to work early—at the six week mark.[210] Plaintiff testified that she came back to work early because she

> received a phone call from Samantha Bright talking about the Pfizer trial and how people were burning out because of COVID and the trial and talking about how . . . the Pfizer trial was going on and how the Janssen trial was going to be opening while the Pfizer trial was going to still be running and *asked* if [Plaintiff] could come back and if [Plaintiff] really still needed to be out.[211]

Plaintiff further testified that she came back to work a week after her phone call with Samantha Bright.[212] Ochsner does not present evidence to rebut Plaintiff's version of the Samantha Bright phone call, but instead argues Plaintiff has no evidence that the phone call constituted coercion to return to work early.

The Fifth Circuit holds "'[g]iving employees the option to work while on leave does not constitute interference'" with FMLA benefits.[213] "But coercing an employee to work while on leave by making the work 'a condition of continued employment'" or by "threaten[ing] [an employee] with an adverse consequence" would "constitute impermissible interference."[214] Plaintiff does not argue or point to evidence to create a genuine dispute of material fact as to whether Samantha Bright, when she called to ask Plaintiff if she could return to work early, threatened Plaintiff with an adverse consequence. Instead, the evidence pointed to by Plaintiff only establishes Samantha Bright telephoned Plaintiff to *ask* her if she, as the supervisor of clinical trials, could return to work early because of COVID-related clinical research needs in the height of the pandemic. The FMLA does not prevent an employer from calling an employee while she

[210] *Id.* at pp. 54-55.
[211] *Id.* at p. 55 (emphasis added).
[212] *Id.* at p. 56.
[213] *Lindsey v. Bio-Medical Applications of Louisiana, L.L.C.*, 9 F.4th 317, 323 (5th Cir. 2021) (quoting *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018)).
[214] *Id.* at 323-24 (quoting *D'Onofrio*, 888 F.3d at 210).

33

is on FMLA leave to pose such a question in the absence of evidence of coercion. Thus, the Court finds summary judgment on Plaintiff's FMLA interference claim on the basis of the Samantha Bright phone call is in order.[215]

### CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's Motion for Summary Judgment[216] is **GRANTED IN PART** and **DENIED IN PART.** With respect to Plaintiff's ADA discrimination claim, ADA retaliation claim, and FMLA retaliation claim, Ochsner's Motion for Summary Judgment is **DENIED**. With respect to Plaintiff's ADA failure to accommodate claim and FMLA interference claim on the basis of Ms. Bright's phone call, Ochsner's Motion for Summary Judgment is **GRANTED**.

**New Orleans, Louisiana, this 14th day of April, 2023.**

_Susie Morgan_
**SUSIE MORGAN
UNITED STATES DISTRICT JUDGE**

---

[215] To the extent Plaintiff would argue, had she briefed the issue, that there is sufficient evidence of coercion because she testified in her deposition she subjectively felt pressured to return to work given Ms. Bright's phone call, *see* R. Doc. 22-3 at p. 60, the Fifth Circuit holds such evidence is insufficient to create a genuine dispute of material fact that an employer required an employee to perform job duties while on leave as a condition of continued employment. *See Lindsey*, 9 F.4th at 324.
[216] R. Doc. 22.